**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-1021 RLW |
| | ) | |
| AMERICAN SCREENING, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on reconsideration of the Federal Trade Commission's ("FTC") Motion for Summary Judgment. (ECF No. 39). For the reasons below, the Court will vacate its earlier decision (ECF No. 72) and grant the FTC's motion in its entirety.

## BACKGROUND

On April 6, 2022, the Court granted the FTC's Motion for Summary Judgment as to American Screening, LLC's violations of both the Merchandise Rule, 16 C.F.R. § 435.2(a)(1), and the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). (ECF No. 72). The Court also granted summary judgment as to Ron and Shawn Kilgarlin's personal liability for those violations. *Id.* The Court denied the FTC's motion as to damages. *Id.* Upon further review of the record and applicable case law, the Court now finds there is no genuine dispute as to any material fact relating to damages and the FTC is entitled to judgment as a matter of law.

## RECONSIDERATION

A partial denial of a motion for summary judgment is an interlocutory order. *Bakker v. McKinnon*, 152 F.3d 1007, 1010 (8th Cir. 1998) ("[T]he denial of summary judgment is interlocutory in nature and not appealable after a full trial on the merits[.]"). A district court has

the inherent power to reconsider an interlocutory order before the entry of judgment. *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995); Fed. R. Civ. P. 54(b) (Any order that adjudicates fewer than all claims "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Because the Court's earlier ruling was interlocutory, it is free to reconsider the FTC's Motion for Summary Judgment. *See Macquarie Bank Ltd. v. Knickel*, 793 F.3d 926, 936 (8th Cir. 2015).[1]

## FACTS[2]

American Screening is a Louisiana Limited Liability Company with its principal place of business in Shreveport, Louisiana. (ECF No. 50, ¶¶ 1-2). Defendant Ron Kilgarlin is the founder, Chief Executive Officer, and President of American Screening. (ECF No. 50, ¶ 4). Defendant Shawn Kilgarlin is the Quality and International Organization of Standardization ("ISO") Manager for the company. (ECF No. 50, ¶ 5). Ron and Shawn are married. (ECF No. 50, ¶ 7).

American Screening markets and sells medical supplies, including personal protective equipment. ("PPE"). (ECF No. 50, ¶ 9). At all relevant times herein, the company utilized a third-party fulfillment warehouse in St. Louis, Missouri. (ECF No. 50, ¶ 223). On certain occasions,

---

[1] Because the issues before the Court have not changed since it first considered the FTC's Motion for Summary Judgment, the Court need not provide notice of its intent to reconsider the motion. *See Macquarie Bank*, 793 F.3d at 936.

[2] These facts are based on the FTC's Statement of Uncontroverted Material Facts (ECF No. 50) and Defendants' Response. (ECF No. 53). Defendants also submitted a Supplemental Statement of Facts. (ECF No. 53, p. 27). Local Rule 4.01(E) states that "[e]very memorandum in opposition must be accompanied by a document titled Response to Statement of Material Facts[.]" The Rule does not contemplate a separate statement of facts by the opposing party. Even if Defendants filed their Supplemental Statement of Facts as a further response to the FTC's Statement, it is improper for two reasons: (1) It does not note the paragraph number to which it responds, as required by Rule 4.01; and (2) It contains numerous irrelevant facts pertaining to the progression of the COVID-19 pandemic. The Court will not consider Defendants' Supplemental Statement of Facts. *See Thompson v. Normandy Sch. Collaborative,* No. 4:19-CV-03220-MTS, 2021 WL 3286810, at *1 (E.D. Mo. Aug. 2, 2021).

customers were able to pick up orders from American Screening's Shreveport location. (ECF No. 50, ¶ 252). Most of the company's sales occur online. (ECF No. 50, ¶ 23).

At the start of the COVID-19 pandemic, American Screening's website stated: "All shipping occurs 24-48 hours after processing, pending product availability." (ECF No. 50, ¶ 72). The company's representatives reiterated this timeframe directly to some customers. (ECF No. 50, ¶ 76). In March 2020, American Screening updated its website to reflect that "[p]roducts may ship 7-10 business days after [an] order has been placed." (ECF No. 50, ¶ 84). The company also offered overnight shipping. (ECF No. 50, ¶ 88).

During at least the early part of the pandemic,[3] American Screening represented to consumers that it had PPE products "in stock" and "available to ship." (ECF No. 50, ¶ 122; ECF No. 53, pp. 9-10). For several months in 2020, the company did not have enough PPE on hand to satisfy demand. (ECF No. 50, ¶¶ 128-137, 146, 147; ECF No. 53, p. 11).[4] American Screening itself acknowledged the shortage of PPE in various customer communications. (ECF No. 50, ¶¶ 99, 107, 139, 140, 164; ECF No. 53, pp. 12-13).

The company's inventory issues resulted in many backorders—orders the company could not immediately fulfill. (ECF No. 50, ¶¶ 165-171; ECF No. 50-22; ECF No. 50-23).[5] During the

---

[3] It is difficult to discern exact dates from the parties' filings.

[4] Defendants attempt to dispute this and many other facts with the deposition testimony of LeeAnn Evans, Ms. Kilgarlin's assistant. (ECF No. 53, p. 11). When asked whether American Screening had inventory of PPE between approximately March 2020 and October 2020, Ms. Evans stated: "I'm sure we did. I just don't know how much. I wasn't involved in that." (ECF No. 50-13, p. 47). But when asked if American Screening had enough inventory to satisfy demand, Ms. Evan's unequivocally stated: "No." *Id.* This testimony does not controvert the FTC's contention that American Screening lacked sufficient inventory. It does the opposite.

[5] Defendants dispute the precise number of backorders but do not dispute the existence of backorders. (ECF No. 53, p. 14). The FTC's analysis shows tens of thousands of backorders. (ECF No. 50, ¶¶ 176-178). Defendants argue that the FTC's analysis is inaccurate. (ECF No. 53, p. 14). The precise number of backorders is not material. It is undeniable that many customers' orders were backordered.

first months of the pandemic, American Screening did not inform all impacted customers that their orders would be delayed. (ECF No. 50, ¶ 180). From March to November 2020, American Screening did not know how much inventory it had and did not update all customers on the status of their orders. (ECF No. 50, ¶¶ 188-89).

For at least some time during the pandemic, online customers were able to order—and many did order—products that were labeled "in stock" that were not actually available. (ECF No. 50, ¶¶ 192-200).[6] American Screening charged customers as soon as they hit "submit." (ECF No. 50, ¶¶ 62-63). In these situations, American Screening could not ship products within seven to 10 business days. (ECF No. 50, ¶ 207). Ms. Bridget Lamette, the company's Customer Service Manager, stated during her deposition that American Screening had no way to ensure backorders went out on time. (ECF No. 50, ¶ 208). She also testified that it was taking "about six weeks before stuff shipped out" and that there were times when American Screening did not ship products for over 30 days. (ECF No. 50-14, pp. 93-94). Ms. Kilgarlin's assistant, Ms. LeeAnn Evans, corroborated Ms. Lamette's testimony about shipping times. (ECF No. 50-13, p. 106).

American Screening also performed "SKU swaps" whereby it filled many orders with brands different from those ordered by customers. (ECF No. 50, ¶ 235). In fact, for a time, the company's website displayed brands of PPE that were no longer in stock. (ECF No. 50, ¶ 239). At his Rule 30(b)(6) deposition, Mr. William Herriage, American Screening's Controller, testified that "many thousands" of orders were swapped without the customer's knowledge or consent. (ECF No. 50-8, p. 115).

---

[6] Defendants dispute the pervasiveness of this problem but do not meaningfully dispute the fact that at some point their website advertised products as "in stock" that were not in fact in stock. (ECF No. 53, p. 16).

In response to shipping delays in early 2020, American Screening did not call all affected customers to determine whether they consented to shipping delays in lieu of a refund. (ECF No. 50, ¶¶ 259-270).[7] At her deposition, Ms. Evans admitted that American Screening denied refunds to customers who requested them for delayed shipments. (ECF No. 50, ¶ 292). Evans also testified that if a customer requested a refund based on a shipping delay, the company did not process the refund but instead shipped the products. (ECF No. 50, ¶ 295).

American Screening did not automatically cancel orders without a prior demand from the customer. (ECF No. 50, ¶ 310). On March 31, 2020, Mr. Kilgarlin sent an email to the company's employees stating, "especially we don't wont [sic] cancelled orders." (ECF No. 50, ¶ 312). From March through December 2020, many customers pursued chargebacks through their credit card companies after not receiving their orders. (ECF No. 50, ¶¶ 317-323). Ms. Lamette testified that the number of chargebacks was "so extreme" that it became her "primary focus." (ECF No. 50, ¶ 322).

Throughout 2020, American Screening received thousands of complaints related to shipping delays or refunds. (ECF No. 50, ¶ 329). The company received over 500 complaints per day throughout 2020. (ECF No. 50, ¶¶ 332-335). The complaints related to delayed shipments,

---

[7] Defendants do not meaningfully dispute this fact. While they claim that "[o]ne hundred percent of customers on American Screening's open orders list were eventually contacted," (ECF No. 53, p. 18), they do not state that the "open orders list" included all affected customers or that all these customers were given the option to choose between a delay or a refund. Their cited deposition testimony also fails to controvert this fact. For example, when asked whether American Screening asked customers if they would like a refund when their order was delayed, Mr. Herriage stated: "In some cases, yes." (ECF No. 50-8, p. 117). When asked if American Screening always called consumers to determine if they wanted to wait or get a different product, Mr. Herriage stated: "'Always' would mean a hundred percent, so I would say no." *Id.*

incorrect shipments, and failure to give refunds. (ECF No. 50, ¶¶335-341). American Screening did not respond to all complaints. (ECF No. 50, ¶ 355).[8]

## LEGAL STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.* Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "The nonmoving party may not rely on allegations or denials" but rather "must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor on more than mere speculation or conjecture." *Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1059 (8th Cir. 2020) (quoting *Ball v. City of Lincoln, Neb.*, 870 F.3d 722, 727 (8th Cir. 2017)).

---

[8] Here again, Defendants argue that American Screening contacted "[o]ne hundred percent of customers" on its "open orders list." (ECF No. 53, p. 18). But Defendants do not contend that the "open orders list" reflected all complaints.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Celotex Corp.*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Torgerson*, 643 F.3d at 1042 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

## DISCUSSION

### I.    Defendant American Screening Violated the Merchandise Rule.

#### A.    *The Merchandise Rule*

The Merchandise Rule requires all mail-, internet-, and phone-based sellers to have a reasonable basis to believe that orders will ship either "within [the] time clearly and conspicuously stated in [a] solicitation; or . . . if no time is clearly and conspicuously stated, within thirty (30) days after receipt of a properly completed order from a buyer." 16 C.F.R. § 435.2(a)(1). If a seller cannot comply with these shipping requirements, the seller must clearly and conspicuously, and without prior demand, give the buyer the option to either consent to the delay or cancel and receive a prompt refund. 16 C.F.R. § 435.2(b)(1). If a seller fails to provide this option and has not shipped the merchandise in accordance with § 425.2(a)(1), it must deem an order canceled and provide a prompt refund to the buyer. 16 C.F.R. § 435.2(c)(5).

A seller's failure to maintain "records or other documentary proof establishing its use of systems and procedures which assure the shipment of merchandise" in accordance with paragraph (a) creates a "rebuttable presumption that the seller lacked a reasonable basis for any expectation of shipment within said applicable time." 16 C.F.R. § 435.2(a)(4). Similarly, a seller's failure to

maintain records relating to the requirements of paragraphs (b) and (c) creates a rebuttable presumption that the seller failed to comply with those requirements. 16 C.F.R. § 435.2(d).

### B.   Discussion

The FTC alleges that Defendants violated the Merchandise Rule by: (1) failing to have a reasonable basis for their advertised shipping claims in violation of 16 C.F.R. 435.2(a)(1); (2) failing to offer consumers, without prior demand, the option to either consent to the delay or cancel and receive a prompt refund in violation of 16 C.F.R. § 435.2(b)(1); and (3) failing to deem orders canceled and provide prompt refunds in violation of 16 C.F.R. § 435.2(c)(5). (ECF No. 39, pp. 8-9). Defendants counter that they had a reasonable basis for shipping estimates and "acted reasonably and in the spirit of [the Merchandise Rule] in resolving delay issues[.]" (ECF No. 52, pp. 8, 19). The Court finds as a matter of law that Defendant American Screening violated the Merchandise Rule.[9]

### 1.   American Screening did not have a reasonable basis for its shipping claims.

American Screening did not have a reasonable basis for its shipping claims as required by 16 C.F.R. 435.2(a)(1). The record shows that American Screening struggled to source PPE throughout the pandemic. (ECF No. 50, ¶¶ 128-137, 148, 150-159, 163). Indeed, for many months, the company did not know how much PPE it had in stock. (ECF No. 50, ¶¶ 188-89). American Screening nevertheless permitted customers to order items that were not in stock. (ECF No. 50, ¶¶ 192-200).[10] For at least part of the pandemic, the company's website stated that orders would ship within seven to 10 business days. (ECF No. 50, ¶ 84). But when customers ordered out-of-stock

---

[9] The FTC also asserts that the Kilgarlin Defendants are individually liable for these violations. The Court will address that issue below.

[10] Defendants assert that they updated the company's website throughout the pandemic to better reflect product availability. Defendants do not, however, explicitly refute the FTC's contention that customers were able to order items that were not in stock. (ECF No. 53, pp. 4, 6, 8-11, 15).

PPE, the company did not ship those orders within the advertised timeframe. (ECF No. 50, ¶ 207). In fact, the company failed to ship many orders within 30 days. (ECF No. 50-14, pp. 93-94; ECF No. 50-13, p. 106). Most orders took "about six weeks" to ship during the early part of the pandemic. (ECF No. 50-14, pp. 93-94).[11] In light of these facts, the company had no reasonable basis to claim that products would ship within 30 days, let alone 10. The Court holds that American Screening violated 16 C.F.R. 435.2(a)(1).

2. American Screening did not give the refund-or-consent option to all necessary customers.

American Screening did not contact all affected customers to provide the refund-or-consent option mandated by 16 C.F.R. § 435.2(b)(1). (ECF No. 50, ¶¶ 259-270). Ms. Evans testified at her deposition that if a customer requested a refund after a shipping delay, American Screening did not process the refund request but instead shipped the products. (ECF No. 50, ¶ 295). While Defendants try to counter these facts, their own citations to the record reinforce the Court's conclusion. For example, Defendants suggest that Mr. Kilgarlin's deposition testimony shows that all relevant customers received the refund-or-consent option. (ECF No. 53, pp. 18). But when asked during his deposition whether American Screening offered refunds to customers who had not asked for them, Mr. Kilgarlin responded: "*I think at some point*, yes, once we understood more clearly what to do[.]" (ECF No. 50-10, p. 97) (emphasis added). Defendants also cite Ms. Lamette's deposition testimony to suggest American Screening complied with the refund-or-

---

[11] Defendants argue that the FTC is not justified in relying on the "24-48-hour fine print" contained in American Screening's shipping policy. (ECF No. 52, pp. 10-13). To the extent the Court considers the FTC's argument in this regard, Defendants ask the Court to note that the shipping policy included the phrase "pending availability." *Id.* The Court is not convinced that the "24-48 hour" language is fine print. But as explained here, the record shows that American Screening failed to comply with its later seven-to-10-day shipping policy, which was undoubtedly clear and conspicuous. In addition, Defendants purported to offer products that were not in stock. (ECF No. 50, ¶¶ 192-200).

consent requirement. But when asked whether representatives were able to contact every single person who had their order swapped, Ms. Lamette stated: "I don't know if they was [sic] able to contact every single person[.]" (ECF No. 50-14, pp. 122-23).[12] If American Screening did not inform customers about "SKU swaps," it necessarily follows that the company did not allow these customers to either (1) wait for the original product to be back in stock (i.e., consent to a shipping delay), or (2) cancel their order and receive a prompt refund.[13]

Defendants also offer their "open orders list" to show that all affected customers were eventually contacted and given the refund-or-consent option. (ECF No. 52-30). Defendants never fully explain what the "open orders list" entails, but the document does not establish compliance with 16 C.F.R. § 435.2(b)(1). First, the log only pertains to 651 orders. *Id.* Mr. Herriage testified that "many thousands" of orders were swapped without the customer's knowledge or consent. (ECF No. 50-8, p. 115). Ms. Lamette testified that American Screening received over 500 calls per day from customers about order statuses throughout 2020. (ECF No. 50, ¶¶ 332-335). Thus, Defendants have not established for the record that the open-orders list accounts for all impacted customers. Second, and more importantly, the log does not show that customers were given the required option under 16 CFR 435.2(b)(1). The issue here is not whether American Screening contacted every affected customer, but whether it contacted those customers *and* gave the refund-or-consent option. In several instances, the log does not address the issue. For example, row 16 pertains to an order placed on March 11, 2020. (ECF No. 52-30, p. 4). The "MemoText" column of Defendants' log states that the product was shipped on May 29, 2020. *Id.* The document says

---

[12] Defendants' contention also ignores the fact that Mr. Herriage testified that "many thousands" of orders were swapped without the customer's knowledge or consent. (ECF No. 50-8, p. 115).
[13] Defendants do not assert that all "SKU swapped" orders shipped within seven to 10 days, or even 30 days.

nothing about receiving consent or offering a refund. Even if American Screening offered 10-day shipping at the time, the product still should have shipped by March 25, 2020, excluding weekends. Put another way, the order was at least 65 days late. Similar examples can be found throughout the log. *Id.*

A seller's failure to maintain records relating to the refund-or-consent requirement in subsection (b)(1) creates a rebuttable presumption that the seller failed to comply with its requirement. 16 C.F.R. § 435.2(d). Defendants have not overcome that rebuttable presumption. Even if the presumption did not exist, Defendants have not set forth specific facts establishing a genuine issue of material fact as to whether customers were offered a refund. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The Court holds that American Screening did not comply with the refund-or-consent requirement in violation of 16 C.F.R. § 435.2(b)(1).

3.   American Screening did not deem orders cancelled and provide prompt refunds after failing to give the "refund-or-consent" option.

American Screening did not cancel orders without prior request as required by 16 C.F.R. § 435.2(c)(5). (ECF No. 50, ¶ 310). Indeed, based upon the record, it seems the company did not cancel some orders even with prior request. (ECF No. 50, ¶ 292). Moreover, on March 31, 2020, Mr. Kilgarlin told employees via email, "we don't wont [sic] cancelled orders." (ECF No. 50, ¶ 312). From March through December 2020, many customers pursued chargebacks through their credit card companies after not receiving their orders. (ECF No. 50, ¶¶ 317-323). Ms. Lamette testified that the number of chargebacks was "so extreme" that it became her "primary focus." (ECF No. 50, ¶ 322). Here again, Defendants' open-orders log does not create a genuine dispute of material facts. While the log shows that some orders were canceled, these cancelations were in response to consumer complaints and it is unclear whether the affected customers received refunds. (ECF No. 52-30).

A seller's failure to maintain records relating to the requirements of paragraphs (c) creates a rebuttable presumption that the seller failed to comply with its requirements. 16 C.F.R. § 435.2(d). Even if the presumption did not exist, Defendants have not set forth specific facts establishing a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. American Screening did not deem orders cancelled and provide prompt refunds after failing to give the "refund-or-consent" option. The Court holds that American Screening violated 16 C.F.R. § 435.2(c)(5).

### C.    Conclusion

While the above is sufficient to show that American Screening violated the Merchandise Rule, the Defendants mercifully concede the point in their Response: "Strict and timely adherence to the letter of [the Merchandise Rule] in this case was not possible during the early delays of the pandemic[.]" (ECF No. 52, p. 14). Defendants appear to seek leniency because of the difficulties presented by COVID-19 pandemic. *Id.* Defendants state that American Screening "did not ignore its customers and did the best it could to follow the spirit of [the Merchandise Rule.]"[14] *Id.* The Court is aware of the complications presented by the pandemic and is not unsympathetic to the challenges it presented to businesses around the country. But unfortunately for American Screening, the law provides no exceptions for sellers that do their "best" during pandemics,

---

[14] Defendants also argue that "reasonably acting" customers could not expect PPE to ship on time. (ECF 52, p. 15). This argument is not well taken. By making this argument, Defendants necessarily suggest that their customers were unreasonable in relying on the company's own representations. But the Merchandise Rule does not account for whether a consumer was reasonable in relying on the seller's representation. The Rule only requires that the representation be "clear and conspicuous." 16 C.F.R. § 435.2(a)(i). While Defendants argue that their 24-48-hour guarantee was not conspicuous, they concede that their later seven-to-10-day representation was "seen at the top of [American Screening's] homepage[.]" (ECF No. 53, p. 33). What is more, "consumer reliance on express claims is presumptively reasonable." *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (cleaned up).

particularly when customers paid upfront for PPE they need to maintain their own lives and livelihood.

Defendants have failed to set forth any material facts to support their defenses. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. Defendants instead rely on allegations and denials and do not substantiate them with sufficient probative evidence. *See Carter*, 956 F.3d at 1059. Viewing the facts in the light most favorable to Defendants, the Court finds there is no genuine issue for trial as to whether American Screening violated the Merchandise Rule. *See Celotex Corp.*, 477 U.S. at 331; *Anderson*, 477 U.S. at 249. The Court will grant the FTC's Motion for Summary Judgment on this claim.

## II.   Defendant American Screening Violated the FTC Act.

### A.   *The FTC Act*

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1345 (2021) (citing 15 U.S.C. § 45(a)). The FTC has authority to enforce the Act's prohibitions. *Id. "*To establish a violation of Section 5, the FTC must show that Defendants made material representations likely to mislead consumers acting reasonably under the circumstances in a way that is material." *FTC v. Real Wealth, Inc.*, No. 10-0060-CV-W-FJG, 2011 WL 1930401, at *2 (W.D. Mo. May 17, 2011) (citing *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006)). Both express and implied representations are actionable under Section 5. *Id.* (citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir.1993)).

### B.   *Discussion*

The FTC argues that American Screening made the following material and misleading representations: (1) American Screening claimed it had certain PPE in stock and "available to

13

ship;" (2) American Screening claimed it would ship orders within 24-48 hours of processing; and (3) American Screening claimed it would ship items within seven to 10 business days after an order was placed. (ECF No. 39, p. 16). Defendants counter that "customers were aware of extraordinary conditions" during the first part of the pandemic and could not "reasonably expect PPE availability or shipping without interruptions or delays." (ECF No. 52, pp. 14-15).

As a threshold matter, the Court agrees with the FTC that American Screening made the alleged representations. Defendants do not argue otherwise. Thus, the Court is left to decide: (1) Whether the representations were material; and (2) Whether they were likely to mislead consumers acting reasonably under the circumstances. *Real Wealth*, 2011 WL 1930401 at *2.

1. <u>American Screening's representations were material.</u>

A representation is material if it involves information likely to affect a consumer's decision to purchase a particular product or service." *Id.* (citing *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)). Here, it is undisputed that American Screening made representations about PPE during a global pandemic. Defendants nevertheless argue that the company's representations were not material because consumers could not reasonably expect PPE to be available. (ECF No. 52, pp. 14-15). Defendants state that a reasonable consumer would not expect to find PPE at the beginning of the pandemic any more than they would expect to find toilet paper. *Id.* Defendants' comparison is unhelpful. First, an advertisement for "in stock" toilet paper in April 2020 would almost certainly have affected consumers' purchasing decisions. Defendants offer no case law to show otherwise. Second, as noted above, "consumer reliance on express claims is presumptively reasonable." *Five-Star Auto Club*, 97 F. Supp. 2d at 529.  The Court finds that American Screening's representations were material.

14

2.   <u>American Screening's representations were likely to mislead a reasonably-acting consumer.</u>

A representation is likely to mislead a reasonably-acting consumer if it is false or if the advertiser "lacked a reasonable basis—or adequate substantiation—for asserting that the representation was true." *Real Wealth*, 2011 WL 1930401 at \*3 (citing *FTC v. Nat'l Urological Group*, 645 F.Supp.2d 1167, 1190 (N.D.Ga.2008)). The records shows that American Screening made impracticable shipping claims for items it did not have in stock. (ECF No. 50, ¶¶ 99, 107, 122, 128-137, 139-140, 146, 147, 164, 192-200). The company received thousands of complaints relating to shipping delays. (ECF No. 50, ¶ 329, 332-341). Most orders took at least six weeks to ship. (ECF No. 50-14, pp. 93-94). This shows that American Screening's shipping claims were false. Further, for reasons discussed above, the company's shipping claims lacked a reasonable basis. Defendants again argue that no reasonable consumer could "expect PPE availability or shipping without interruption or delays." (ECF No. 52, pp. 14-15). But Defendants offer no authority for their contention and fail to acknowledge that "consumer reliance on express claims is presumptively reasonable." *Five-Star Auto Club*, 97 F. Supp. 2d at 529. The Court finds that American Screening's representations lacked a reasonable basis and were likely to mislead a reasonably-acting consumer.

### C.   *Conclusion*

The Court finds that American Screening's claims lacked a reasonable basis in violation of 15 U.S.C. § 45(a). The Court will grant the FTC's Motion for Summary Judgment on this claim.

### III.   **Individual Liability Under the FTC Act**

Individuals may be liable under the FTC Act when: (1) The corporate defendant violated the Act; (2) The individual defendants participated directly in the wrongful acts or practices or had authority to control the corporate defendants; and (3) The individual defendants had some

knowledge of the wrongful acts or practices. *FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 809 (D.S.D. 2013) (cleaned up). The Court has already concluded that American Screening violated the FTC Act. The Court now finds that the Kilgarlin Defendants had authority to control American Screening and had at least some knowledge of its wrongful acts.

Shawn Kilgarlin was the Quality and ISO Manager for American Screening. (ECF No. 50, ¶ 5). The record shows that she also held herself out as the company's Chief Operating Officer. (ECF No. 50, ¶¶ 424-429). When asked about her role as COO during her deposition, Mrs. Kilgarlin invoked her Fifth Amendment right against self-incrimination. (ECF No. 50-11, pp. 18, 22-24, 46-47, 49, 128-129, 133). The record further shows that Mrs. Kilgarlin conducted meetings about inventory, ordered changes to the company's website, approved cancelations and purchases, supervised employees, oversaw customer service, and helped Mr. Kilgarlin run the company when he needed assistance. (ECF No. 50, ¶ 430-442). When asked about these topics at her deposition, Mrs. Kilgarlin again invoked the Fifth Amendment. (ECF No. 50, ¶¶ 65, 126-27, 181, 202, 230, 258, 304-309, 427, 442-44, 464, 467, 475-94, 497, 499-502, 504).

Because this is a civil matter, the Court may draw adverse inferences from Mrs. Kilgarlin's invocation of the Fifth Amendment. *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976). But to succeed on its Motion for Summary Judgment, the FTC must submit evidence corroborating the adverse inference. *SEC v. Colello*, 139 F.3d 674, 678 (9th Cir.1998). It has done so. "Authority to control a company is evidenced by active involvement with business matters and corporate policy including assumption of officer duties." *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985). As discussed above, the record establishes that Mrs. Kilgarlin had at least some authority over inventory, customer service, and web content—all of which are pertinent here. (ECF No. 50, ¶ 430-442). She even held herself out as the COO. (ECF No. 50, ¶¶ 424-429). Put another

way, Mrs. Kilgarlin was actively involved with business matters and corporate policy. No reasonable jury could conclude that Mrs. Kilgarlin was unaware of the company's wrongful practices. The Court will grant FTC's Motion for Summary Judgment as to Mrs. Kilgarlin's individual liability.

Ron Kilgarlin is the founder, CEO, and President of American Screening. (ECF No. 50, ¶ 4). It is undisputed that Mr. Kilgarlin had control over American Screening as CEO and President. (ECF No. 50, ¶¶ 368-383). Mr. Kilgarlin oversees department managers, website content, policies and procedures, expenditures, and at least some marketing efforts. *Id.* Defendants argue that Mr. Kilgarlin should not be individually liable because he disapproved of problematic marketing and advertising. (ECF No. 52, p. 18). But in doing so, Defendants rely on their Supplemental Statement of Facts. (ECF No. 53, p. 27). As noted above, the Court will not consider Defendants' Supplemental Statement of Facts. *See supra* note 1.

There is no doubt that Mr. Kilgarlin exercised control over American Screening. Considering the extent of his control, no reasonable jury could conclude he was unaware of the company's wrongful acts. The Court will grant the FTC's Motion for Summary Judgment as to Mr. Kilgarlin's individual liability.

### IV.   Monetary and Injunctive Relief

The FTC seeks a permanent injunction against Defendants to prevent future violations of the FTC Act. (ECF No. 39, p. 19). The FTC also seeks the refund of money to consumers for late or unshipped orders. *Id.*

#### A.   *Injunctive Relief*

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that the FTC, in a "proper case," may seek a permanent injunction to enjoin violations of "any provision of law enforced" by the

FTC. "Even if the defendants have altered some of their deceptive practices, injunctive relief is still appropriate when there is a 'cognizable danger of recurrent violation.'" *FTC v. Kitco*, 612 F. Supp. at 1296 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also FTC v. Sec. Rare Coin & Bullion Corp.*, No. CIV. A. 3-86-1067, 1989 WL 134002, at *19 (D. Minn. Sept. 11, 1989), aff'd, 931 F.2d 1312 (8th Cir. 1991). "[T]he egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature." *Id.*

Here, the FTC seeks to permanently enjoin Defendants from advertising or selling protective goods and services. (ECF No. 39, p. 20). The FTC also proposes various compliance-monitoring measures to ensure compliance with the permanent injunction. *Id.* Such relief is appropriate.

The egregious nature of Defendants' conduct warrants an order prohibiting further misrepresentations in the advertising or sale of protective goods and services. *See Kitco*, 612 F.Supp. at 1296. Compliance monitoring is also warranted considering the extent of Defendants' misconduct. Here, Defendants made several misrepresentations regarding shipping and availability of PPE during a global pandemic. While Defendants have altered some of their practices, injunctive relief is still appropriate as the pandemic is ongoing and there is a "cognizable danger of recurrent violation." *Id.* Such relief will not unduly harm Defendants. *Id.* It will not put them out of business but will simply ensure future compliance with Section 5 of the FTC Act, 15 U.S.C. § 45. *Id.* The Court will grant the FTC's Motion for Summary Judgment as to permanent injunctive relief.

**B.    Equitable Monetary Relief**[15]

Section 19 of the FTC Act, 15 U.S.C. 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from a violation of any rule promulgated under the FTC Act respecting unfair or deceptive acts or practices, including the refund of money or property. Here, the FTC seeks refunds in the amount of $14,651,185.42. (ECF No. 39, p. 19). The Court holds that equitable monetary relief is appropriate in this case and there is no genuine dispute as to the appropriate amount of such relief.

For many decades, the FTC was able to win equitable monetary relief from district courts under Section 13(b). *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1347 (2021). The Supreme Court recently clarified that Section 13(b) does not authorize such relief. *AMG Cap. Mgmt.*, 141 S. Ct. at 1347. The Supreme Court noted, however, that nothing in its decision prohibits the FTC from using its authority under Sections 5 and 19 to obtain restitution on behalf of consumers. *Id.* at 1352. Here, the FTC seeks to do just that.

In *FTC v. Credit Bureau Center, LLC*, the FTC sued Credit Bureau Center ("CBC") for violations of the FTC Act and the Restore Online Shopper Confident Act ("ROSCA")*. FTC v. Credit Bureau Ctr., LLC*, No. 17 C 194, 2021 WL 4146884, at *1 (N.D. Ill. Sept. 13, 2021). The district court issued a permanent injunction and ordered CBC to pay over $5 million in equitable monetary relief. *Id.* On appeal, the Seventh Circuit vacated the restitution award after holding that Section 13(b) does not authorize equitable monetary relief. *Id.* Following the Supreme Court's decision in *AMG*, the FTC filed a motion with the district court to amend the judgment to instead impose the equitable monetary relief under Section 19. *Id.* The district court found that the FTC is

---

[15] The parties filed a Joint Stipulation in this matter on March 17, 2022. (ECF No. 56). As part of that stipulation, the FTC expressly waived its right to legal damages and clarified that it only seeks equitable monetary relief.

entitled to such redress. *Id.* at *3. The district court noted that "if a rule promulgated under Section 18 is violated, the FTC can seek legal and equitable remedies, including restitution, from violators, under [S]ection 19 of the FTC Act." *Id.* at *2. The case is again on appeal before the Seventh Circuit. *Id.*

Applying the reasoning of the district court in *FTC v. Credit Bureau Ctr.*, the Court finds that the FTC may seek equitable relief under Section 19 for violations of the Merchandise Rule in the amount of $14,651,185.42. (ECF No. 39, p. 19). Defendants argue that FTC's figure is "unreasonable and unnecessary to redress consumer harm in this case because: (1) Harm to customers that ultimately received PPE was nominal since they still received the PPE; (2) Customers who did not receive PPE were given the opportunity to cancel for a refund; and (3) The award amount unfairly classifies all orders shipped after 48 hours as 'late'". (ECF No. 52, p. 18).

The United States District Court for the Central District of California recently addressed these issues in *FTC v. QYK Brands, LLC*, No. SACV 20-1431 PSG (KESx), 2022 WL 1090257, at *1 (C.D. Cal. Apr. 6, 2022). In *QYK Brands*, the FTC sued the defendants for violations of the Merchandise Rule and FTC Act arising from defendants' marketing and sale of hand sanitizer during the COVID-19 pandemic. *Id.* The FTC sought over $3 million in refunds for consumers, which the FTC calculated as the defendants' net revenue less any already-issued refunds. *Id.* The defendants argued that "the FTC should take nothing without showing that shipping delays actually injured consumers, and if injury is established, that the Court should limit the monetary relief to Defendants' net profits, not their net revenue." *Id.* The court concluded that "because the FTC's theory of [Merchandise Rule] liability here turns on Defendants' pre-purchase, materially misleading shipping promises, the presumption of actual reliance standard can apply here." *Id.* The defendants in *QYK Brands* further argued that customers who had received hand sanitizer would

receive a "windfall" by also receiving a refund. *Id.* The Central District of California—relying on the Ninth Circuit's decision in *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (per curiam) —concluded that "the amount of redress due . . . need not be decreased by the fair market value of the product or service received" because "Defendants' deception induced the sale in the first place." *Id.*

Although not controlling in this jurisdiction, the Court is persuaded by the court's reasoning in *QYK Brands*. As in *QYK Brands*, the FTC's theory of liability in this case turns on Defendants' "pre-purchase, materially misleading shipping promises." For that reason, the Court presumes that consumers actually relied upon Defendants' shipping statements. *See QYK Brands, LLC*, 2022 WL 1090257. Also like the defendants in *QYK Brands*, Defendants here induced the sale of PPE with misleading statements, so it is inapposite that some customers actually received their orders. *Id.*

Further, despite Defendants' arguments to the contrary, the FTC is not required to prove individual consumer injury and reliance. *See FTC v. Sec. Rare Coin & Bullion Corp*., 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2004); *Figgie Int'l*, 994 F.2d at 605. To require such a showing "would thwart and frustrate the public purposes of FTC action." *Sec. Rare Coin*, 931 F.2d at 1316 ("This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class of defrauded investors."). "In cases of pervasive, persistent contempt, the use of gross receipts simply allows courts to assure that those injured receive full compensation." *Kuykendall*, 371 F.3d at 765. Even though the large number of consumers affected by the Defendants' deceptive trade practices creates a risk of uncertainty regarding the exact amount of damages warranted in this case, Defendants must bear that risk. *See id*. (citing *Bigelow v. RKO*

21

*Radio Pictures, Inc.*, 327 U.S. 251, 256 ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.")).

The FTC has provided support for its calculation of damages through a detailed declaration by data analyst Elizabeth Miles. (ECF No. 50-19).[16] In her Declaration, Ms. Miles explains that her analysis is based on Defendants' own data along with the deposition testimony of Mr. Herriage, American Screening's Controller. *Id.* at ¶¶ 8, 16, 17. Specifically, Ms. Miles relied upon the FTC's Exhibits 75 and 76. *Id.* According to Mr. Herriage's testimony, these spreadsheets reflect all invoices for PPE or COVID products sold in 2020. (ECF No. 50-17, p. 39:14-21). Columns H and I reflect the total amount customers paid for PPE orders in 2020, while Columns L and M reflect the total amount of refunds issued to customers with PPE orders in 2020. *Id.* at 82:4-7; 85:22-86:1; 87:7-10. Columns B, Q, R, and S provide shipping information for each order. (ECF Nos. 75, 76). Using this data, Ms. Miles concluded that American Screening's net revenue for PPE—that is, its total revenue for PPE less any refunds issued—was $14,651,185.42. (ECF No. 50-19, ¶ 57). Ms. Miles's method of calculation comports with the case law in this area. *See Kuykendall*, 371 F.3d at 765 ("[W]hen the FTC has proven a pattern or practice of contemptuous conduct at the liability stage by clear and convincing evidence, a presumption arises that allows the district court to use all revenue attributable to the contemptuous conduct—the gross receipts from consumers—as a

---

[16] Defendants argue throughout their Response to the FTC's Statement of Material Facts that Ms. Miles's declaration, and the analysis therein, is inadmissible because the FTC did not designate her as an expert witness. (ECF No. 52). Federal Rule of Evidence 1006, however, permits the use of summaries, charts, or calculations to prove the content of voluminous materials that cannot be conveniently examined by the Court. Fed. R. Evid. 1006. Ms. Miles need not be a designated expert for this Court to consider her declaration. *See SEC v. Amazon Natural Treasures, Inc.*, 132 F. App'x 701, 703 (9th Cir. 2005) (upholding admissibility of testimony under Rule 1006 of accountant who organized and summarized voluminous financial records).

baseline for assessing sanctions."); *QYK Brands*, 2022 WL 1090257 ("[T]he appropriate measure of consumer redress is net revenues, not net profits."). Defendants cannot meaningfully dispute the accuracy of the FTC's calculation of damages because the FTC's calculation is based upon Defendants' own data.

This Court has "broad remedial discretion to grant an appropriate form of equitable relief" under Section 19 of the FTC Act. *Cf. Sec. Rare Coin*, 931 F.2d at 1316. After careful review of the record, the Court agrees with the FTC that $14,651,185.42 is the appropriate amount of equitable relief in this matter. The facts support this calculation and are not materially disputed. The Court recognizes, however, that some customers may have been satisfied with their orders, even if delayed. For that reason, the FTC shall implement a plan that requires customers to make refund requests rather than receiving refunds outright. *See QYK Brands*, 2022 WL 1090257. The FTC shall hold the sum in an escrow account and Defendants' customers may seek refunds directly from the FTC. *Id.* The FTC shall return all unclaimed funds to Defendants no later than 120 days after consumers are notified of the refund program, less the FTC's costs in administering the program. *Id.* (citing *Figgie Int'l*, 994 F.2d at 607-08).[17]

## CONCLUSION

For the reasons above, the Court will vacate its earlier decision and grant the FTC's Motion for Summary Judgment in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that the Court's Memorandum and Order dated April 6, 2022 (ECF No. 72) is **VACATED**.

---

[17] In addition to accounting for the possibility that some customers were satisfied with their orders, this approach avoids the imposition of exemplary or punitive damages, which 15 U.S.C. § 57b(b) prohibits. *See Figgie Int'l*, 994 F.2d at 607-08).

**IT IS FURTHER ORDERED** that the Federal Trade Commission's Motion for Summary Judgment (ECF No. 39) is **GRANTED** in its entirety.

**IT IS FURTHER ORDERED** that the Federal Trade Commission shall file a revised proposed judgment consistent with this Order no later than **August 15, 2022**.

**IT IS FINALLY ORDERED** that all other pending motions (ECF Nos. 73, 78) in this matter are **DENIED as moot**.

_Ronnie L. White_

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 14th day of July, 2022.

24